FILED

2017 MAR 10  PM 3 51

U.S. DISTRICT COURT
NEW HAVEN, CT.

3:17mj294(SALm)

**STATE OF CONNECTICUT**                    **CITY OF NEW HAVEN**
                                      : ss:
**COUNTY OF NEW HAVEN**                    **March 10, 2017**

## AFFIDAVIT

Ryan Mensing, a Special Agent with the Drug Enforcement Administration, being duly sworn, deposes and states:

1.      I am a Special Agent of the Drug Enforcement Administration ("DEA") and have been so employed since 2003.  I am currently assigned to the Bridgeport High Intensity Drug Trafficking Area Task Force ("HIDTA Task Force"), which is comprised of personnel from the DEA, Norwalk Police Department, Stamford Police Department, Stratford Police Department, Milford Police Department, Bridgeport Police Department, and the Connecticut State Police. During the course of my career, I have participated in numerous criminal investigations including investigations into suspected narcotics trafficking and money laundering.   My participation in the investigations has included coordinating controlled purchases of narcotics utilizing confidential informants, cooperating witnesses and undercover law enforcement officers; coordinating the execution of search and arrest warrants; conducting electronic and physical surveillance; analyzing records related to narcotics trafficking; testifying in Grand Jury and District Court proceedings; and interviewing individuals and other members of law enforcement regarding the manner in which narcotics traffickers obtain, finance, store, manufacture, transport and distribute controlled substances.    I have participated in multiple investigations involving the use of court-authorized interception of wire communications.

2. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I am a co-case agent on the investigation that is the subject of this affidavit and application and I have personally participated in the investigation concerning violations of the federal laws listed in this affidavit.

3. I submit this Affidavit in support of an application for a warrant pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. 2703(c)(1)(A), authorizing agents of the DEA to ascertain the physical location of the cellular telephone assigned call number ▮▮▮▮-0848, with International Mobile Subscriber Identity Number ("IMSI") ▮▮▮▮▮▮, subscribed to ▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮, used by ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮, with service provided by Sprint (hereafter "TARGET TELEPHONE"), including but not limited to E-911 Phase II data (or other precise location information) concerning TARGET TELEPHONE (the "Requested Information"), for a period of thirty (30) days. In addition, I submit this affidavit in support of an application for a warrant authorizing the installation and use of a mobile tracking device in an automobile currently being utilized ▮▮▮, that is a silver 2005 Acura MDX bearing Connecticut registration ▮▮▮▮▮ with VIN number ▮▮▮▮▮▮▮▮, the registered owner being ▮▮▮▮▮▮ and hereinafter referred to as SUBJECT VEHICLE.

4. This Affidavit sets forth facts and evidence that are relevant to the requested warrant and court orders, but does not set forth all the facts and evidence that I have gathered

3

during the course of the investigation of this matter. The statements contained in this affidavit are based, in part, on information provided by special agents of the DEA, Task Force Officers, and information provided by confidential sources.

5.     As a result of my participation in this investigation, through interviews and the analysis of reports submitted by DEA, local law enforcement personnel, and by the analysis of reports of controlled purchases, physical surveillance, confidential source debriefings, and other reports and documents, I am familiar with all aspects of this investigation. The information contained in this affidavit is based on this familiarity, and upon information which I have reviewed and determined to be accurate and reliable. Also, based on my training and experience set forth above, I am familiar with methods employed by illegal Drug Trafficking Organizations ("DTOs") in furtherance of their illegal businesses. Since this Affidavit is being submitted for the limited purpose of the aforementioned authorizations, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the foundation necessary to support the issuance of the requested warrant and court orders.

6.     Probable cause exists to believe, and I do believe, that the requested information will constitute or lead to evidence of offenses involving conspiracy to possess with the intent to distribute narcotics, the possession of narcotics with the intent to distribute, and the use of a communications facility, in violation of Title 21, United States Code, Sections 846 and 841(a)(1) (the "TARGET OFFENSES"), as well as to the identification of individuals who are engaged in the commission of these offenses. For the reasons set out in this Affidavit and Application for Warrant, there is probable cause to believe, and I do believe, that the TARGET OFFENSES have

4

been committed, are being committed, and will continue to be committed by ▇▇▇▇ and by others presently unknown. Further, there is probable cause to believe, and I do believe, that ▇▇▇▇ is using the TARGET TELEPHONE and SUBJECT VEHICLE to commit the TARGET OFFENSES.

## INVESTIGATION BACKGROUND

7.      In August 2015, the DEA Bridgeport Resident Office ("BRO") began an investigation into the drug trafficking activities of an unknown Colombian male, subsequently identified as ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. A DEA Confidential Source ("CS") provided information that ▇▇▇ is a large scale cocaine distributor in Fairfield County, CT.

8.      In August of 2015, BRO and Norwalk Police Department {"NPD") Special Services ("NPDSS") members met with a DEA CS, about making a controlled purchase of cocaine from ▇▇▇. On August 3, 2015, at approximately 4:30 pm., CS was instructed by BRO members to contact ▇▇▇ on the TARGET TELEPHONE via text or cellular telephone about purchasing cocaine. CS was given a recording device to record any/all cell phone conversations with ▇▇▇. CS made verbal contact with ▇▇▇ on the TARGET TELEPHONE and ▇▇▇ directed the CS to a restaurant in Norwalk, CT. A short time later, BRO and NPD members established surveillance in the vicinity of the restaurant. At approximately, 4:55 pm., BRO and NPD members observed the CS arrive and park his/her vehicle. Shortly thereafter, BRO and NPD members observed the CS the SUBJECT VEHICLE. Shortly thereafter, the CS departed the area followed by BRO members. Shortly thereafter, BRO and NPD members observed the SUBJECT VEHICLE depart the restaurant at a high rate

of speed. BRO and NPD members were able to catch up to the SUBJECT VEHICLE and follow the SUBJECT VEHICLE back to the restaurant parking lot. Shortly thereafter, BRO members observed the CS exit the SUBJECT VEHICLE and walk back to his/her vehicle and depart the area. Shortly thereafter, BRO and NPD observed the SUBJECT VEHICLE depart the area. BRO and NPD members attempted to conduct mobile surveillance; however, the SUBJECT VEHICLE made an abrupt U-turn and began travelling in the opposite direction. Based on my training and experience, I believe the SUBJECT VEHICLE was driving in a counter surveillance manner in attempt to detect law enforcement personnel. BRO and NPD members were unable to locate the SUBJECT VEHICLE and surveillance was terminated. BRO members met the CS at a pre-determined location and retrieved a folded paper receipt containing a white powder like substance (Exhibit 1). BRO members submitted Exhibit 1 to the Northeast Regional Laboratory for testing and the chemical analysis testing revealed Exhibit 1 was positive for cocaine hydrochloride with a purity rate of 33% (percent).

9. On August 5, 2015, BRO and NPD members met with the CS for the purpose of utilizing the CS to make a controlled purchase of cocaine from ███████. The CS was instructed by BRO members to contact ██████ via cellular telephone on the TARGET TELEPHONE and order 28 grams of cocaine. In the prior transaction, referenced in paragraph 8, ██████ provided CS with a free sample. In any event, on August 5, 2015, the CS made contact with ██████ on TARGET TELEPHONE and ██████ informed the CS that he (██████) would not be available until later that night. ██████ informed the CS to meet at the same location as before. BRO and NPD members established surveillance in the vicinity of a restaurant. BRO members provided the CS with $1,450 in Official Advanced Funds ("OAF") for the purpose of purchasing

6

narcotics from ███. At approximately 8:30 pm., the CS departed the meet location, as followed by BRO members. A short time later, BRO and NPD members observed the CS arrive at restaurant. At approximately 8:44 pm., BRO members observed the SUBJECT VEHICLE operated by ███ arrive in the area of the restaurant. Shortly thereafter, BRO members observed the CS walk over to the SUBJECT VEHICLE and meet with ███. BRO members observed an unidentified male (UM1) exit the SUBJECT VEHICLE, and meet with the CS and ███. Shortly thereafter, the CS, ███ and UM1 entered the SUBJECT VEHICLE and departed the area. BRO and NPD members were able to maintain visual surveillance on the SUBJECT VEHICLE. BRO members observed the SUBJECT VEHICLE pull into the parking lot of the Toys "R" US located at 59 Connecticut Ave, Norwalk, CT. BRO members observed UM1 exit the SUBJECT VEHICLE and walk to the rear of Jerrys Upholstery. BRO members observed UM1 enter a Honda Civic bearing Connecticut registration ███ and depart the area. A short time later, BRO members observed the Honda Civic return to the rear of Jerrys Upholstery and park. BRO members observed UM1 exit the Honda Civic and walk back towards and enter the SUBJECT VEHICLE. Moments later, BRO members observed the SUBJECT VEHICLE depart the area and return to the restaurant parking lot. BRO members observed the CS exit the SUBJECT VEHICLE and walk back towards his/her vehicle. The CS departed the area followed by BRO members. BRO members met the CS at a pre-determined location and retrieved a white powder like substance in a clear plastic bag (Exhibit 2). BRO members submitted Exhibit 2 to the Northeast Regional Laboratory for testing and the chemical analysis testing revealed Exhibit 2 was positive for cocaine hydrochloride with a purity rate of 43% (percent).

7

10.    Shortly after the controlled purchase of Exhibit 2 the CS had lost contact with
███████. The CS had made numerous attempts to contact ███████ with negative results. The
CS believed ███████ had left the area or had travelled back to Colombia.

11.    On January 27, 2017, BRO members conducted a quarterly interview with the CS
and the CS stated the following in sum and substance that he/she had been approached by
███████, in early January 2017. The CS stated this was the same Colombian male who the BRO
obtained Exhibit 1 (the sample of cocaine on August 3, 2015) and purchased Exhibit 2 (cocaine)
on August 5, 2015.   According to the CS, ███████ asked the CS if he/she would be willing to
transport kilos of cocaine to the Boston area.   The CS provided the phone of ███████ as (███████
███████0848 (TARGET TELEPHONE).   The CS stated that he/she told the CS that he would let
███████ know at a later date if he/she was interested in transporting narcotics to Boston.   The CS
was not wearing a transmitter or recording device when this conversation took place outside the
presence of BRO members.

11.    On February 22, 2017, BRO members initiated surveillance of a meeting between
the CS and ███████ in a predetermined parking lot on Connecticut Ave., Norwalk, CT.   The
purpose of the meet was for the CS and ███████ to have a follow-up conversation following up
on the latter's request to have the CS transport multi-kilogram quantities of cocaine up to the
Boston Massachusetts area.   BRO members instructed the CS to contact ███████ on the
TARGET TELEPHONE.   The CS did so, and he/she and ███████ arranged to meet at a parking
lot on Connecticut Ave. in Norwalk, CT.   BRO members equipped the CS with a transmitting

8

device and a recorder. At approximately 3:00 p.m., BRO members observed the SUBJECT VEHICLE parked in the parking lot. The SUBJECT VEHICLE was occupied by ███. A short time later, the CS arrived at the parking lot of and BRO members observed the CS enter the SUBJECT VEHICLE. While in the SUBJECT VEHICLE, the CS and ███ discussed a new narcotic called "Tusibi" (pink cocaine) and whether the CS was interested in purchasing a kilogram. ███ described how the kilogram was enroute from Honduras through Mexico and into the United States. ███ informed the CS that a kilogram of "Tusibi" cost approximately $100,000. In previous conversations with ███, the CS had mentioned a family member (CS-2) who might be interested in purchasing kilograms of cocaine. ███ also inquired about the CS's family member (CS-2) who might be interesting in purchasing kilograms of cocaine. CS informed ███ that he/she would contact his/her family member to see if he/she was interested in purchasing kilograms of cocaine. At approximately 3:30 p.m., BRO members observed the CS exit SUBJECT VEHICLE and enter his/her vehicle. At that time, surveillance units followed as the SUBJECT VEHICLE exited the parking lot and headed west of Connecticut Ave., towards the on-ramp of I-95. The SUBJECT VEHICLE then headed north via the on-ramp of I-95. At that time, the SUBJECT VEHICLE accelerated at a high rate of speed making it difficult for surveillance units to keep up. Surveillance was then terminated once the SUBJECT VEHICLE reached speeds of up to 90 mph. For safety concerns of civilians and law enforcement personnel surveillance was terminated on the SUBJECT VEHICLE.

12. On March 7, 2017, members of the BRO conducted surveillance of a meeting between CS, CS-2, and ███ in Norwalk, CT. The purpose of this meeting was for the CS to

9

introduce CS-2 to ▮▮▮▮ as a multi-kilogram dealer who was interested in purchasing multi-

kilograms of "Tusibi" or cocaine. Prior to the meeting, BRO members instructed the CS to

contact ▮▮▮▮ on the TARGET TELEPHONE. The CS did so, and he and ▮▮▮▮ agreed to

meet at a parking lot on Connecticut Ave., in Norwalk, CT. Prior to CS and CS-2 departing for

the meeting, BRO members equipped CS-2 with a transmitting device and a recording device.

BRO members established surveillance in the area of the parking lot. BRO members observed

CS and CS-2 arrive in the area of the parking lot. A short time later, BRO members observed

the SUBJECT VEHICLE arrive in the parking lot. BRO members observed CS and CS-2 meet

with ▮▮▮▮ at the SUBJECT VEHICLE. During the meeting BRO members monitoring the

transmitter heard ▮▮▮▮ discuss how six kilograms of "Tusibi had arrived but were already

sold. ▮▮▮▮ further stated that the organization had kilograms of cocaine in Queens, NY.

▮▮▮▮ told CS-2 that a kilogram of cocaine was worth $45,000, but that he could drop it down

to $44,000. At that time, ▮▮▮▮made a phone call to an unidentified individual ("UI") in front

of CS and CS-2. ▮▮▮▮ and the UM began to discuss transporting a kilogram of cocaine in

exchange for the money. After a brief conversation on the telephone, ▮▮▮▮ hung up the phone

with the UI and told CS-2 that further discussions would be needed. At that time, CS-2 exited

VILLA's vehicle and entered his/her vehicle. At that time, ▮▮▮▮ walked over to CS-2's vehicle

with the same UI on speaker phone. The UI told CS-2 that he (UI) would be willing to bring up

a kilogram of cocaine tomorrow (March 8, 2017) around noon. CS-2 told the UI and ▮▮▮▮ that

he/she had enough money for two kilograms of cocaine, but that he/she would possibly have

enough for three depending if his/her associate would be willing to put up more money. CS-2

advised ▮▮▮▮ and the UM that once he/she drove back to Rhode Island, he/she would contact

10

████ and advise him if he/she would be purchasing three kilograms. CS-2 further explained to

████ that if he/she would be purchasing three kilograms, he/she would need a couple of extra

days to get the money together. Following the meeting, ████ in the SUBJECT VEHICLE

quickly departed the parking lot and surveillance units were unable to maintain visual

surveillance of the SUBJECT VEHICLE. Following the meeting, CS and CS-2 met with

members of the BRO. CS-2 stated he/she believed that ████ was utilizing an application (app)

to talk to the UM. CS-2 further stated he/she saw the name ████████ on the screen of the

phone.

13. On March 8, 2017, BRO members obtained toll records of the TARGET

TELEPHONE and toll records did not reflect any incoming or outgoing calls on the TARGET

TELEPHONE during the meeting with the CS and CS-2. Toll records will not reflect any

incoming/outgoing calls if the subject is utilizing certain phone applications such as WhatsApp

and Skype.

14. Beginning the week of March 12, CS-2 is going to attempt to coordinate a meeting

between ████ and ████ Source of Supply for the purpose of making a three kilogram

purchase of cocaine. During this meeting, BRO members will attempt to identify any/all

individuals involved with the discussion of the three kilogram purchase of cocaine and make

every attempt to conduct surveillance in an attempt to identify all possible stash houses. Later

next week, CS-2 will seek to negotiate the price per kilogram with ████ or his source of

supply and arrange a meeting where the narcotic transaction will take place.

15. Since in or about 2002, Confidential Source (CS) had been signed up with the

11

Bridgeport DEA. Since that time, the CS has been actively engaged in infiltrating narcotic organizations by making controlled purchases of narcotics, making recorded phone calls, and introducing Undercover Agents/Officers ("UC") to narcotic traffickers on behalf of the DEA. The CS has provided truthful and reliable information for the past 15 years.

16. Beginning in or about 2015, Confidential Source 2 (CS-2) has been signed up with DEA New York. Since that time, CS-2 has conducted numerous operations with DEA throughout Latin America and in the United States. CS-2 has been responsible for multi-kilograms seizures of heroin, cocaine, and hundreds and thousands of dollars. CS-2 has provided truthful and reliable information for the past 2 years.

## USE OF MOBILE TRACKING DEVICE

17. During the course of this investigation physical surveillance has been attempted on _____ but has met with limited success. As noted above, surveillance attempts on _____ by law enforcement officers, including myself, have proven difficult because _____ used several counter-surveillance measures such as sudden U-turns, looping the block, and driving at high rates of speed which would make following him dangerous for law enforcement and others..

18. Thus, based on my experience in this case and my training, I believe that will continue to be extremely difficult to establish and maintain surveillance on _____ as he travels in and around Fairfield and New Haven counties in Connecticut. I have frequently conducted surveillance on targets of investigations. In order to conduct a successful surveillance it is important to maintain visual contact on the subject vehicles. Law enforcement officers have to closely follow which often results in the subjects of the surveillance becoming aware of the

12

surveillance. Attempts are made by law enforcement to switch vehicles, but these actions still do not overcome the fact that visual surveillance must be maintained on the subject vehicles.

19. I therefore request authorization to install and monitor a mobile tracking device onto the SUBJECT VEHICLE. Use of a mobile tracking device will allow the investigating agents to monitor the locations to which the SUBJECT VEHICLE is driven without having to remain in close sight surveillance which will greatly reduce the risk that the investigation would be compromised. I believe that monitoring the mobile tracking device will lead to evidence of the aforementioned offenses as to the identification of individuals who are engaged in the commission of these offenses and related crimes.

20. I request authorization to install a mobile tracking device on the SUBJECT VEHICLE white it is in the District of Connecticut. ███████ parks the SUBJECT VEHICLE in the parking lot of his complex and it may be necessary to enter onto private property to access the SUBJECT VEHICLE in order to effect the installation and removal of the mobile tracking device. To ensure the safety of the executing officers and to avoid premature disclosure of the investigation, it is requested that the Court authorize installation and removal of the tracking device during both daytime and nighttime hours.

21. In the event that the Court grants this application, there will be periodic monitoring of the mobile tracking device during both daytime and nighttime hours for a period of 45 days following the date the warrant is issued. The tracking device may produce signals from inside private garages or other such locations not open to the public or visual surveillance.

22. I respectfully request that the order and accompanying affidavit and application in support thereof be sealed until further order of the court. The contents of these documents

13

reveal information concerning an ongoing investigation. Premature disclosure of these documents could result in the destruction of evidence, could compromise the safety and security potential cooperating witnesses, and could frustrate this investigation by alerting the targets of the investigation to the nature of the probe., the techniques employed by law enforcement personnel, and the evidence to date, thus limiting the possible use of the grand jury to develop further admissible evidence and limiting the ability to conduct other search warrants that may be necessary.

23. In accordance with title 18, United States Code, Section 3103a(b), and Federal Rule of Criminal Procedure 41(f)(3), I request that the order granting this application delay notification of the execution of the order for a period not to exceed 30 days after the use of the mobile tracking device has ended because there is a reasonable cause to believe that providing immediate notification would seriously jeopardize an ongoing investigation. As demonstrated above, there is probable cause to believe that ▮ is engaged in continued criminal activity. If ▮ were to learn of the existence of the requested Order or to learn of the installation of the mobile tracking device, it would disclose to ▮ that he is under investigation by law enforcement officers. Based on my training and experience, I believe that this would cause ▮ to destroy evidence, such as narcotics, drug ledgers or the proceeds of narcotics transactions, and/or flee the jurisdiction and otherwise seriously jeopardize the ongoing criminal investigation. Notice therefore should be delayed so as to avoid seriously jeopardizing the ongoing criminal investigation involving ▮.

24. Wherefore I respectfully request that the Court issue a warrant authorizing members of the DEA or their authorized representatives, including but not limited to other law

14

enforcement agents and technicians assisting in the above-described investigation, to install a mobile tracking device in or on the SUBJECT VEHICLE within the District of Connecticut within 10 calendar days of the issuance of the requested order, and to remove said mobile tracking device from the SUBJECT VEHICLE after the use of the tracking device has ended; to enter onto private property to effect said installation and removal; and to use that mobile tracking device for a period of 45 days following the issuance of the order, including when the mobile tracking device is inside private garages and other locations not open to the public or visual surveillance, when the subject vehicle is within or outside the District of Connecticut but within the United States.

## GPS AUTHORIZATION REQUEST

25.    Based on the foregoing, there is probable cause to believe that the Requested Information will lead to evidence regarding the activities described above.   Based upon all of the foregoing facts, as well as my training and experience, I believe that there is probable cause to believe that                    is currently utilizing the TARGET TELEPHONE, that the Requested Information will help agents locate the TARGET TELEPHONE and meaningfully direct physical surveillance efforts, and will, correspondingly, assist in the location and possible identification of                    cocaine source of supply or locations in which he stores his controlled substances.

26.    WHEREFORE, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. 2703(c)(1)(A), I request that the Court issue a warrant and Order authorizing agents of the DEA to obtain the Requested Information for the TARGET TELEPHONE for a period of thirty (30) days.

15

27.    IT IS FURTHER REQUESTED that the Court direct Sprint to assist agents of the

DEA by providing all information, facilities and technical assistance needed to ascertain the

Requested Information, and further direct Sprint, the service provider for the TARGET

TELEPHONE, to initiate a signal to determine the location of the TARGET TELEPHONE on

the service providers' network or with such other reference points as may be reasonably

available and at such intervals and times as directed by the law enforcement agent serving the

proposed warrants, and to furnish the technical assistance necessary to accomplish the

acquisition unobtrusively and with a minimum of interference with such services as that provider

accords the user(s) of the TARGET TELEPHONE, for a period of thirty (30) days.    Reasonable

expenses incurred pursuant to this activity will be processed for payment by the DEA.

28.    IT IS FURTHER REQUESTED that the Court authorize execution of the warrant

at any time of day or night, owing to the potential need to locate the TARGET TELPHONE

outside of daytime hours.    IT IS FURTHER REQUESTED that the Court authorize the

monitoring of the TARGET TELEPHONE take place within and outside the District of

Connecticut should ▮▮▮▮ leave the District of Connecticut.

29.    IT IS FURTHER REQUESTED that, pursuant to 18 U.S.C. 3103a (b) and Federal

Rule of Criminal Procedure 41(f) (3), the Court authorize notice to be delayed for a period of 30

days after the termination of the monitoring period authorized by the warrant or any extensions

thereof, because there is reasonable cause to believe that providing immediate notification would

seriously jeopardize the investigation.

30.    IT IS FURTHER REQUESTED that the warrant and the related orders and this

Affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in

16

order to avoid premature disclosure of the investigation, guard against flight, and better ensure

the safety of agents and others, except that working copies may be served on Special Agents and

other investigative and law enforcement officers of the DEA, federally deputized state and local

law enforcement officers, and other government and contract personnel acting under the

supervision of such investigative or law enforcement officers, and Sprint as necessary to

effectuate the Court's Order.


Ryan Mensing
Special Agent
Drug Enforcement Administration


Sworn to and subscribed before me on this the 10 day of March, 2017, at New Haven,
Connecticut.


Hon. Sarah A.L. Merriam
United States Magistrate Judge